UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAYNA LAZERSON et. al., )<br>)<br>Plaintiff(s), )<br>)<br>v. )<br>)<br>CAPISTRANO UNIFIED SCHOOL )<br>DISTRICT, )<br>)<br>Defendant(s). )<br>)<br>)<br>)<br>)<br>)<br>)<br>_____ | CASE NO. SACV 09-958 DOC (ANx)<br><br>**O R D E R FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This case is an administrative appeal. Plaintiffs, Shayna Lazerson and her parents Jerold and Lori Lazerson (collectively, "Plaintiffs"), appeal the findings of the California Office of Administrative Hearings ("OAH") in favor of Defendant Capistrano Unified School District ("School District"). The Court conducted a one day bench trial on this matter on March 14, 2011. Plaintiffs and Defendant filed trial briefs and lodged a copy of the Administrative Record with the Court. At the bench trial, the Court heard oral argument from both sides. Neither party

called any witnesses or introduced evidence outside of the Administrative Record.[1]  Having considered the submissions by the parties and the evidence contained in the Administrative Record, the Court hereby enters its Findings of Fact and Conclusions of Law in conformity with Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

### Factual Background

1. Shayna Lazerson ("Shayna"), now a nineteen year old woman, was a high school student whose parents Lori and Jerold Lazerson ("Parents") resided within the geographic boundaries of the Capistrano Unified School District ("School District"). [Administrative Record ("AR") 1571.]

2. Although Shayna received high grades her freshman year, by Shayna's sophomore year, her grades had begun to slip and Shayna had begun to experience other emotional difficulties.  [AR 627.]

3. On November 16, 2006, Parents received a phone call from Shayna at school: Shayna was crying and school staff told Parents that Shayna admitted to wanting to hurt herself.  [AR 627-28.]

4. Parents responded by taking Shayna to College Hospital, where she was admitted based on signs of self-mutilation and attempted suicide and where she ultimately received eight days of in-patient treatment.  [AR 547, 627-28.]

5. School District staff report that, after the hospitalization incident, Shayna went on to have a successful sophomore year. [School District's Opp. at 3 (citing AR 467) (a copy of Shayna's transcript indicating that Shayna passed all of her classes, including college preparatory classes).]

---

[1] On the date of the bench trial, the parties, by stipulation, submitted an exhibit that had been inadvertently omitted from the initial filing of the Administrative Record: Plaintiff's Exhibit 49, a clinical interview of Shayna Lazerson conducted by George R. Davies, M.C. on October 17, 2007. The Court has considered this exhibit as part of the Administrative Record.

6. Shayna, however, reports drinking and taking Advil at school in order to "numb out" for the remainder of the year. She also says that she periodically left class for up to thirty minutes at a time. [AR 575-76.]

7. When Shayna's junior year began in 2007, Shayna attended only two weeks of school before being hospitalized again after abusing the family dog, being physically abusive toward her father and making suicidal threats. [AR 576, 634.]

8. Shayna's mother spoke to school nurse Julia Malone on September 19, 2007. Shayna's mother informed Ms. Malone that Shayna was in the hospital and that she would require home-hospital instruction. [AR 635.]

9. On Friday, October 5, 2007, Shayna's father emailed the District to inquire about an Individualized Education Program ("IEP"), or other help the district could provide for Shayna. [AR 884-885.]

10. On Monday, October 8, 2007, a school official phoned Shayna's mother to set up a Student Study Team ("SST") meeting for the following day, October 9, 2007. [AR 637.]

11. The SST meeting took place on October 9, 2007. Shayna, her parents, and school staff attended. The participants discussed Shayna's hospitalization, her diagnoses of bipolar disorder and "major depressive" disorder, her suicidal ideations, and her sexual promiscuity. [AR 638, 816, 820.]

12. At the October 9, 2007 SST meeting, Shayna's parents delivered to the School District a letter that asked for "a comprehensive assessment for special education services for our child under IDEA" and a "concurrent assessment by the Department of Mental Health under Charter 26.5 of the Government Code." [AR 638-41.]

13. On October 15, 2007, Shayna's mother spoke with a school counselor named Ms. Von Duering. Dr. Von Duering asked Shayna's mother if Parents could bring Shayna in for a special education assessment the next day, October 16, 2007. [AR 1296-98] During the phone call, Dr. Von Duering orally informed Shayna's mother of the family's rights under the Individuals with Disabilities Act ("IDEA"). [AR 1296]. No formal assessment plan was provided to Parents during or immediately following this phone call. [*Id.*]

14. Shayna's mother declined Dr. Von Duering's offer to evaluate Shayna on October 16, 2007. Shayna's mother informed Dr. Von Duering that Parents were planning to take Shayna to a residential placement facility – Copper Canyon Academy ("CCA") in Arizona – on October 16, 2007 and that an evaluation appointment on that day would consequently prove impossible. [AR 1299.]

15. There is no evidence that Parents based their decision not to bring Shayna in for assessment on October 16, 2007 on the fact that the School District had yet to provide them with a formal assessment plan.

16. On the contrary, shortly after getting off the phone with Ms. Gelsinger, Shayna's mother called back and offered to bring Shayna in for an evaluation later that same day, October 15, 2007 [AR 852.] Parents had not been provided with an assessment plan at the time that Shayna's mother made this offer. [AR 852-53.]

17. The School District apparently did not respond to Shayna's mother's offer to bring Shayna in for assessment on October 15, 2007.   [AR 852.]

18. Parents took Shayna to CCA on October 16, 2007. [AR 824.]

19. On October 16, 2007, Dr.Von Duering sent Parents a letter, summarizing the phone conversation that occurred between Dr. Von Duering and Shayna's mother on October 15, 2007 and providing Parents with a written copy of the procedural safeguards available to parents under the IDEA. [AR 271.] In this letter, Dr. Von Duering reiterated that she "would be happy to complete a full psycho-educational evaluation for Shayna should [Parents] make her available to do so." [*Id.*].

20. On October 20, 2007, Parents sent a letter to the School District reiterating Shayna's series of hospitalizations, her depression and bipolar disorders, her suicide threats and the other circumstances that led Parents to place Shayna at CCA. [AR 474-75.] In this letter, Parents expressed their strong dissatisfaction with the School District, stating that they "want[ed] to go on record and state that we believe that Tesoro high school . . . 'dropped the ball' when it came to Shayna," and asserting that Parents were "extremely upset and disturbed" by how the School District handled their case. [*Id.*]

21. School representative, Jamie Runyon, emailed Parents on October 30, 2007, asking to meet and test Shayna. [AR 472]. The email proposed several specific appointment times for Parents' review. [*Id.*] Mr. Runyon's email did not contain a formal assessment plan; rather, Mr. Runyon stated that a formal assessment plan would follow the meeting with Shayna. [*Id.*].

22. There is no evidence that Parents responded to Mr. Runyon's October 30, 2007 email.

23. The next communication between Parents and the School District occurred just before June 6, 2008, when Parents phoned the School District to request reimbursement for the costs of Shayna's enrollment at CCA. [*See* AR 273 (June 6, 2008 letter from School District to Parents stating that the "purpose of this letter is to respond to recent phone conversations that occurred between you and [School District] staff, in which you requested that the [School District] fund your daughter's current placement at [CCA].")].

24. In response to Parents' phone call, the School District sent Parents a letter explaining that "[i]n order to consider this request, [School District] needs to complete an assessment to determine if Shayna qualifies for special education services." [*Id.*]. The School District proposed to send an assessor to evaluate Shayna at CCA. A formal assessment plan was attached to the letter. [*Id.*]. This was the first time that a formal assessment plan had been provided to Parents. AR 853.

25. After asking the School District to correct certain factual inaccuracies contained in the assessment plan, Parents signed and returned the assessment plan to the School District on June 16, 2008. [*Id.*]

26. Shayna was assessed and a report was generated in November 2008, at which time Shayna was found eligible for special education services and was offered an IEP from the School District. [AR 451.]

27. Shayna remained at CCA from October 2007 to December 2008, when she graduated.

28. There is no evidence that, prior to Shayna's enrollment at CCA, Shayna had received special education or related services from the School District or any other public agency.

## Procedural Background

29. In order to secure reimbursement for the costs associated with Shayna's attendance at CCA, Parents filed a request for an OAH due process hearing on November 6, 2006. [AR 1.]

30. Beginning on April 20, 2009, Administrative Law Judge Stella Owens-Murrell ("ALJ") conducted a five-day hearing on Plaintiff's request, during which time seventeen witnesses testified, including several expert witnesses. [AR 506-1419].

31. The expert witnesses offered conflicting opinions on Shayna's educational needs at the time of her placement at CCA. Dr. Burnett, a clinical psychologist who had treated Shayna for stress and anxiety prior to her placement at CCA, testified that residential treatment was necessary. [AR 546.] Plaintiffs also called Shayna's primary therapist at CCA, Sara Wasserman, and another therapist who had provided therapy to Shayna, Cherie Mills, to testify; they offered opinions that concurred with Dr. Burnett's. [AR 698-701, 717] Finally, Plaintiffs called Dr. Vivien Chan, an expert in mental health, who testified that residential treatment was an appropriate option – but not necessarily the only appropriate option. [AR 935.] Finally, the School District's expert, Dr. Joseph Kenan, after reviewing Shayna's records at the public high school and at CCA, opined that residential placement was not needed. [AR 1573.]

32. On June 1, 2009, the ALJ issued a detailed, twenty-one page decision denying Plaintiffs' request for relief. [AR 1571-96].

33. The ALJ determined that the School District's "Child Find" obligations to locate, identify and assess students with potential educational disabilities were triggered on October 9, 2007, the date of the SST meeting and the date on which Parents presented the School District with a letter requesting assessment. [AR 1586, ¶ 14].

34. Neither party contests the ALJ's finding that the School District's "Child Find" obligations sprung to life on October 9, 2007. [Pl.'s Opening Brief at 12 (titling the heading of one section of the brief: "The Administrative Law Judge Properly Found That Defendant Violated Child Find As Of October 9, 2007."); *id.* at 13 ("The administrative

|   |   |   |
|---|---|---|
| 1 |  | law judge correctly found that Child Find was triggered for Shayna in October 2007 . . |
| 2 |  | ..."); School District's Opp. at 9 n.5 ("The ALJ found that for the few days following |
| 3 |  | October 9, 2007, the District was in technical violation of the "child find" provisions[.] . . |
| 4 |  | . The District did not appeal that finding of a technical violation."); Pl.'s Reply at 1 |
| 5 |  | (titling a section of the brief: "The ALJ's Finding That The District Violated Child Find |
| 6 |  | As Of October 9, 2007 Has Not Been Appealed And Is Final."); *id.*(explaining that the |
| 7 |  | ALJ found that Child Find was triggered as of October 9, 2007 and stating that "[t]he |
| 8 |  | ALJ's finding of a Child Find violation by the District has not been challenged by either |
| 9 |  | party and is a final decision.").[2] The Court therefore adopts this finding as its own. |
| 10 | 35. | The ALJ determined that the School District had committed technical violations of its |
| 11 |  | "Child Find" obligations by failing to timely provide Parents with an assessment plan or |
| 12 |  | written notice of procedural safeguards and by failing to timely complete an assessment |
| 13 |  | of Shayna. [AR 1586, *¶¶* 13, 20, 14]. |
| 14 | 36. | The ALJ concluded, however, that the School District's technical violations did not |
| 15 |  | amount to a substantive violation of the IDEA or of the California Education Code, |
| 16 |  | because the School District's actions did not cause Shayna to be denied a Free |
| 17 |  | Appropriate Public Education ("FAPE"). The ALJ instead found that it was Parents' |
| 18 |  | actions in unilaterally removing Shayna to an out-of-state private placement facility that |
| 19 |  | stalled the assessment process and resulted in the non-provision of services. [*Id.*, ¶ 14.]. |
| 20 | 37. | The ALJ further determined that the opinion of the School District's expert, Dr. Kenan, |
| 21 |  | regarding the non-necessity of residential placement was more persuasive than the |
| 22 |  | opinions of Plaintiffs' experts. [AR 1574.]. The ALJ based her reliance on Dr. Kenan on |
| 23 |  | the grounds that Dr. Kenan specialized in adolescent psychiatry and that he had |
| 24 |  | experience in the development and implementation of IEPs, whereas Plaintiffs' experts |

---

[2]Initially, Plaintiffs' Complaint appeared to appeal the ALJ's finding that Child Find was not triggered in the fall of 2006. Complaint, Prayer for Relief, ¶ 1. Plaintiffs briefing and their arguments at the hearing, however, indicate that Plaintiffs have since accepted this portion of the ALJ's decision.

|   |     |   |
|---|-----|---|
| 1 |     | did not have specific experience in the IEP formulation process. [*Id.*] |
| 2 | 38. | Plaintiffs argue that the ALJ erroneously credited Dr. Kenan's opinion, given that Dr. Kenan had never personally evaluated Shayna, whereas three of the experts Plaintiffs offered had provided treatment to her. |
| 5 | 39. | The Court finds Plaintiffs' arguments regarding the lack of personal interaction between Shayna and Dr. Kenan persuasive. As explained below, however, courts owe deference to the findings of the ALJ in the area of witness credibility, given the ALJ's role in observing live testimony. In light of the competing evidence, the Court concludes that it is uncertain whether Shayna required residential treatment at the time of her placement at CCA. |
| 11 | 40. | Plaintiffs appealed the ALJ's decision denying their request for reimbursement of the costs associated with Shayna's attendance at CCA to this Court on August 19, 2010.[3] [Docket 1] |
| 14 | 41. | The matter was set for a one-day bench trial on March 15, 2011. [Docket 25]. |
| 15 | 42. | Prior to the bench trial, each side submitted full briefing in support of it's position. [Dockets 35, 36, 38]. |
| 17 | 43. | At the bench trial, each side argued it's position and responded to questions from the Court. [Docket 41]. The parties offered no evidence beyond that contained in the Administrative Record. |

## CONCLUSIONS OF LAW[4]

### Standard of Review

1. When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and "basing its

---

[3] Plaintiffs' Complaint initially listed an additional cause of action for denial of civil rights under Section 504 of the Rehabilitation Act of 1974. Prior to the bench trial, the parties stipulated to dismissal of that cause of action. [Docket 27.]

[4] To the extent that any of the statements below are more appropriately construed as findings of fact, they shall be considered as such.

8

1  decision on the preponderance of the evidence," can grant relief as the court determines is appropriate.  20 U.S.C. § 1415(i)(2)(C).

2. "Because Congress intended states to have the primary responsibility of formulating each individual child's education, this court must defer to [the state agencies'] 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." *Hood v. Encinitas Union School Dist.*, 486 F.3d 1099, 1104 (9th Cir. 2007) (internal citations and quotations omitted).  Accordingly, the "'thorough and careful' findings of a hearing officer are entitled to deference." *Id.*

3. Deference to the ALJ is especially warranted in the area of witness credibility. *Amanda J. ex. rel. Annette J. v. Clark County School Dist.*, 267 F.3d 877, 889 (2010) (direction courts reviewing IDEA due process appeals to follow "general principles of administrative law which give deference to the unique knowledge and experience of state agencies while recognizing that the [hearing officer] who receives live testimony is in the best position to determine issues of credibility.").

**The School District's Obligations Towards Students With Educational Disabilities**

4. Congress, through the IDEA, has mandated that local educational agencies seek out students with exceptional educational needs, evaluate and assess those needs, and ultimately provide any needed free and appropriate public education.  20 U.S.C. § 1412(a)(3).  California Education Code ("Cal. Educ. Code") § 56300 echoes this federal mandate.  The School District's responsibility to seek out students with special educational needs is commonly referred to as a "Child Find" obligation.

5. A student with a possible need for special education services must be assessed in all areas of suspected disability.  20 U.S.C. § 1414(a)(1)(A).  If the student qualifies for special services, the school district must formulate an IEP for that student in accordance with 20 U.S.C. § 1414 (d).

6. Federal and California law requires that, prior to evaluating a student for IEP eligibility, notice be given to the parents that describes the evaluation process that the school intends to conduct.  20 U.S.C. § 1414(b)(1)(A); Cal. Educ. Code § 56321(a).

7. California law requires that this notice be in the form of a written assessment plan which must be provided to the parents within fifteen (15) days of a referral for assessment for special education. Cal. Educ. Code § 56321(a).

8. "Referral" means any written request for assessment, including one made by a parent. Cal. Educ. Code § 56029.

9. A school district must make efforts to obtain informed consent from a student's parents before conducting an initial evaluation. 20 U.S.C. § 1414(a)(1)(D)(i)(I).

10. If a student's parents refuse to consent or do not respond to a school district's requests for consent, the school district may – but is not required to – conduct an initial evaluation, unless doing so conflicts with state laws regarding parental consent. 20 U.S.C. § 1414(a)(1)(D)(ii)(I); Cal. Educ. Code § 56321(c)(2)-(3).

*11.* Where assessments are mandatory, Cal. Educ. Code § 56344(a) gives school districts sixty days to complete the assessments and to hold a meeting with the parents to discuss the results. The sixty-day clock does not run during school holidays in excess of five days. *Id.*

### The School District's Actions Did Not Result in a Denial of FAPE

12. In this case, the ALJ concluded – in a finding that was not challenged by either party and is therefore adopted by this Court – that the School District's "Child Find" obligations sprung to life on October 9, 2007.

13. Under 20 U.S.C. § 1415(d)(1)(A) and Cal. Educ. Code § 56301, the School District was required to provide Parents with a written notice of procedural safeguards at the time of Shayna's initial referral for evaluation. In addition, pursuant to Cal. Educ. Code § 56321(a), the School District was required to provide Parents with a formal assessment plan within fifteen days of that date. Finally, under Cal. Educ. Code § 56344(a), the School District was required to complete Shayna's evaluation within sixty days.

14. The School District did not provide Parents with written notice of their procedural safeguards at the time of Shayna's referral for assessment. In addition, a written assessment plan was not given to Parents until June 2008. Finally, the School District did

1  not complete its evaluation of Shayna until November 2008.  Therefore, several
2  procedural violations of the IDEA and of the California Education Code occurred.
3  15. The finding of a procedural violation, however, does not end the inquiry.  The fact of a
4  procedural violation, standing alone, does "not automatically require a finding of a denial
5  of a FAPE.'"  *M.L. v. Federal Way School Dist.*, 394 F.3d 634, 645 (9th Cir. 2005)
6  (quoting *W.G. v. Board of Trustees of Target Range School Dist. No, 23, Missoula,*
7  *Mont.*, 960 F.2d 1479, 1484 (9th Cir. 1992), *superceded by statute on other grounds, as*
8  *stated in R.B. v. Napa Valley Unified School Dist.*, 496 F.3d 932 (9th Cir. 2007)).  Only
9  "procedural inadequacies that result in the loss of educational opportunity, or seriously
10 infringe on the parents' opportunity to participate in the IEP formulation process, clearly
11 result in the denial of a FAPE."  *Id.*
12 16. In this case, the Court agrees with OAH that the School District's procedural non-
13 compliance did not amount to a substantive denial of FAPE.  The failure to provide an
14 assessment plan and the late provision of the notice of safeguards notwithstanding, the
15 School District made clear its intentions to evaluate Shayna and, depending on the results
16 of the evaluation, to develop an appropriate IEP for her.  The Court notes its factual
17 finding that by October 15, 2007 – only six days after the ALJ found that the School
18 District's Child Find obligations were triggered – the School District was taking
19 affirmative steps to schedule on assessment, contacting Parents and offering to evaluate
20 Shayna the very next day.  It was Parents who refused that offer.
21 17. Parents implied, at trial, that their refusal to bring Shayna in for evaluation on October 16,
22 2007 was based on the School District's failure to provide them with a formal assessment
23 plan.  The evidence, however, does not support this assertion.  As explained in the
24 Court's finding of fact section, the preponderance of the evidence indicates that Parents'
25 refusal to bring Shayna in for an evaluation on October 16, 2007 was based not on
26 concern over the lack of a formal assessment plan, buton Parents' unwillingness to delay
27 the trip to CCA.
28 18. Therefore, although the School District committed a procedural violation by failing to

11

1 provide Parents with a formal assessment plan, this procedural violation was not the
2 substantive cause of any denial of FAPE. Rather, it was Parents' action in unilaterally
3 removing Shayna to an out-of-state private placement facility with only one day's notice
4 to the School District, followed by months of non-communication with the School
5 District, that made the assessment process fall apart. *See Patricia P. v. Board of Ed. of*
6 *Oak Park*, 203 F.3d 462, 469 (7th Cir. 2000) (approvingly citing the ALJ's findings that
7 "[parent] removed [student] unilaterally from the state, knowingly frustrating the
8 District's ability to conduct its own timely evaluation, and has made no genuine offer to
9 make [student] available to the District for an evaluation . . . The District has committed
10 no violation by its actions."); *see also id.* at 268 (finding that a student's "unilateral
11 withdrawal from [the public high school] meant that there was no opportunity [for the
12 school district] to modify his IEP to meet his educational needs" and that "in these
13 circumstances reimbursement for the expenses of his provide education is not required
14 even if it were assumed that private placement was appropriate to meet [the student's]
15 needs.").

16 19. The Court does not mean to cast aspersions on Parents' actions. Parents acted swiftly in
17 response to an emergency situation and did what they felt they needed to do in order to
18 protect their daughter from harm. School districts, however, are not responsible for
19 providing emergency mental health services. *See* Cal. Gov. Code § 7576(f) (explaining
20 that "the procedures set forth in this chapter are not designed for use in responding to
21 emergency situations or other situations requiring immediate responses," and directing
22 parents "in these situations [to] seek services from other public programs or private
23 providers, as appropriate."). Therefore, to the extent that Shayna's placement at CCA
24 arose in response to a mental health emergency, the School District need not reimburse
25 Parents for the expenses they incurred.

26 20. The Court further emphasizes that the act of sending Shayna to CCA on October 16,
27 2007, standing alone, would not have absolved the School District of responsibility for
28 Shayna's education. Had Parents expressed continued interest in working with the

1 School District to create an IEP for Shayna, the School District would have been required to accommodate them. Parents, however, expressed no such interest. On the contrary, after sending Shayna to CCA, Parents sent an email (and a letter) to the School District expressing their dissatisfaction with the district. Parents then rejected the School District's continued offers of assistance, refusing, for instance, to respond to Jamie Runyan's October 30, 2007 email reiterating the School District's request to evaluate Shayna.

21. In sum, the Court finds that it was Parents' actions, not the School District's technical violations, that caused a breakdown in the IEP evaluation process. Accordingly, the School District's actions did not "result in the denial of a FAPE." *M.L.*, 394 F.3d at 645.

**Principles of Equity Do Not Counsel Reimbursement in this Case**

22. Even if the Court were to hold that the School District's procedural violations resulted in a denial of FAPE, the reimbursement that Parents request would not be appropriate in this case.

23. Before 1997, the IDEA was silent on the subject of private school reimbursement. *Forest Grove School Dist. v. T.A.*, 523 F.3d 1078, 1085 (9th Cir. 2008). Courts, however, had granted such reimbursement as "appropriate" relief under the principles of equity pursuant to 20 U.S.C. § 1415(i)(2)(C). *Id.* In amendments to the IDEA enacted in 1997, Congress added a new section to the Act entitled "Payment for education of children in private schools without consent of or referral by the public agency." This provision states, in pertinent part, that:

> If parents of a child with a disability, *who previously received special education and related services* under the authority of a public agency, enroll the child in a private . . . school without the consent of or referral by the public agency, a court or hearing officer may require the agency to reimburse the parents for the costs of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in

13

|   |   |   |
|---|---|---|
| 1 |  | a timely manner prior to that enrollment |
| 2 |  | 20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added). The addition of this amendment |
| 3 |  | caused some uncertainty regarding whether, by explicitly referring to children who |
| 4 |  | had "previously received special education and related services," Congress meant |
| 5 |  | to bar reimbursement of private school expenses for students who had not |
| 6 |  | previously received such services. |
| 7 | 24. | In *Forest Grove School Dist. v.T.A.*, 523 F.3d 1078 (9th Cir. 2008), the Ninth Circuit |
| 8 |  | resolved this uncertainty and held that Congress had not intended to impose a per se bar |
| 9 |  | on private school reimbursement for children who had never received special education |
| 10 |  | services from a public agency. *Id.* at 1087 (holding that "[i]nterpreting the 1997 |
| 11 |  | amendments to prohibit categorically reimbursement to students who have not yet |
| 12 |  | received special education and related services runs contrary to [the] express purpose [of |
| 13 |  | IDEA]," and stating that such an interpretation "would lead to the absurd result that the |
| 14 |  | parents of a child with a disability must wait (an indefinite, perhaps lengthy period) until |
| 15 |  | the child has received special education in public school before sending the child to an |
| 16 |  | appropriate private school, no matter how uncooperative the school district."). The Ninth |
| 17 |  | Circuit held that courts and hearing officers retained the power, under 20 U.S.C. § |
| 18 |  | 1415(i)(2)(C), to order "reimbursement for the cost of providing an appropriate education |
| 19 |  | when a school district has failed to offer a child a free appropriate public education." *Id.* |
| 20 |  | at 1088 (internal citations and quotations omitted). |
| 21 | 25. | When examining a claim for private school reimbursement on behalf of a child who never |
| 22 |  | previously received special education or related services from a public entity, the rules |
| 23 |  | enunciated in 20 U.S.C. § 1415(a)(10)(C) do not apply. *Id.* at 1087. Rather, parents of |
| 24 |  | such students "may recover reimbursement, if at all, only under principles of equity . . .." |
| 25 |  | *Id.* |
| 26 | 26. | In determining whether equitable reimbursement is appropriate, "the conduct of both |
| 27 |  | parties must be reviewed." *Id.* at 1088. In particular, the Ninth Circuit has directed |
| 28 |  | courts to consider: the amount of notice provided to a school district before sending a |

|   |   |   |
|---|---|---|
| 1 |  | child to private school, *id.* at 1089 (citing *Ash v. Lake Oswego Sch. Dist. No. 7J*, 980 F.2d |
| 2 |  | 585, 586 (9th Cir. 1992); the existence of other, more suitable placements for the student, |
| 3 |  | *id.* (citing *W.G. v. Board of Trustees of Target Range School Dist. No. 23, Missoula,* |
| 4 |  | *Montana*, 960 F.2d 1479, 1487 (9th Cir. 1992)); the effort expended by the parent[s] in |
| 5 |  | securing alternative placements, *id.*, and the general cooperative or uncooperative |
| 6 |  | position of the school district. *Id.* |
| 7 | 27. | Because Shayna never received special education or related services prior to her |
| 8 |  | enrollment at CCA, Parents would be entitled to reimbursement for her private school |
| 9 |  | expenses, if at all, only under the principles of equity pursuant to 20 U.S.C. § |
| 10 |  | 1415(i)(2)(C). |
| 11 | 28. | Considering the factors identified by the Ninth Circuit, the Court holds that the principles |
| 12 |  | of equity do not weigh in favor of reimbursing Plaintiffs for the expenses associated with |
| 13 |  | Shayna's attendance at CCA. |
| 14 | 29. | The incredibly short notice provided to the School District of Parents' plan to send |
| 15 |  | Shayna to CCA strongly counsels against reimbursement.  Before sending Shayna to |
| 16 |  | CCA, Parents did not follow the preferred course of action of asking "the school district |
| 17 |  | to provide services . . and giv[ing] them a reasonable opportunity to complete the process |
| 18 |  | of evaluating the student and making a placement recommendation." *Forest Grove,* 523 |
| 19 |  | F.3d at 1089 (quoting *Ash*, 980 F.2d at 589).  Instead, Parents gave the School District |
| 20 |  | only one day's notice of their intention to take Shayna to an out-of-state private |
| 21 |  | placement facility.  In addition, Shayna's removal to CCA took place only seven days |
| 22 |  | after the ALJ found that the School District's obligations under Child Find were |
| 23 |  | triggered.  The principles of equity do not weigh in favor of requiring the School District |
| 24 |  | to fund a private school education for a student that the district did not have a reasonable |
| 25 |  | opportunity to evaluate. |
| 26 | 30. | Whether other, more suitable placements existed for Shayna at the time of her enrollment |
| 27 |  | at CCA was a source of debate in front of the OAH.  As explained in the Court's finding |
| 28 |  | of fact section, the evidence is inconclusive on this issue.  The Court finds, however, that |

|   |   |   |
|---|---|---|
| 1 |  | the uncertainty regarding Shayna's educational needs at the time of her placement at CCA |
| 2 |  | must weigh against reimbursement. For, this uncertainty would not exist if Parents had |
| 3 |  | afforded the School District a reasonable opportunity to evaluate Shayna. It would be |
| 4 |  | unfair to "force the school district to rely solely on an independent evaluation conducted |
| 5 |  | at the parents' behest" in determining whether Parents merit reimbursement for private |
| 6 |  | school tuition. *Johnson v. Duneland Sch. Corp.*, 92 F.3d 554, 558 (7th Cir. 1996). The |
| 7 |  | lack of clarity regarding Shayna's educational needs at the time of her enrollment at CCA |
| 8 |  | therefore counsels against reimbursement. |
| 9 | 31. | Parents' failure to research alternative placements before sending Shayna to CCA also |
| 10 |  | militates against reimbursement. Parents spent only one week attempting to work with |
| 11 |  | the School District to formulate in-district special education options before sending |
| 12 |  | Shayna to a private, residential placement. As explained above, the Court respects |
| 13 |  | Parents' right to decide that sending Shayna to CCA on October 16, 2007 was necessary |
| 14 |  | in order to protect Shayna from imminent harm. After sending Shayna to CCA, however, |
| 15 |  | Parents made no further effort to cooperate with the School District in order to formulate |
| 16 |  | a special education plan until just before June 6, 2008. Parents' lack of effort in this |
| 17 |  | regard counsels against reimbursement. |
| 18 | 32. | Finally, as discussed above, notwithstanding its tardiness in providing a formal |
| 19 |  | assessment plan and a written notice of procedural safeguards, the School District made |
| 20 |  | great effort to cooperate with Parents. As noted above, the School District made plans to |
| 21 |  | evaluate Shayna a mere eight days after their Child Find obligations took effect. Even |
| 22 |  | after Parents stymied these efforts, the School District continued to reach out to Parents, |
| 23 |  | reiterating its desire to evaluate their daughter. The School District's cooperative stance |
| 24 |  | towards Parents weighs against forcing the School District to reimburse Parents for their |
| 25 |  | unilateral decision to send Shayna to an expensive private school. |
| 26 | 33. | In sum, the principles of equity do not counsel in favor reimbursement. Plaintiffs' request |
| 27 |  | for reimbursement must be denied. |
| 28 | /// |   |

**CONCLUSION**

1. For the foregoing reasons, the Court DENIES Plaintiffs' appeal of the decision of the OAH denying Plaintiff's request for reimbursement for the costs associated with Shayna's attendance at Copper Canyon Academy.

2. Defendant's shall prepare and file a proposed judgment for the Court's signature within ten (10) days of the filing of this order.

IT IS SO ORDERED.

DATED: March 25, 2011

_____
DAVID O. CARTER
United States District Judge